AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>1460 4th Street, Level B<br>Santa Monica, CA 90401 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:20-MJ-3000

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. §§ 4512 and 4513 | Accumulation of Designated Scarce Materials with Intent to Price Gouge |
| 31 U.S.C. § 5324 | Structuring Transactions to Avoid Reporting Requirements |

The application is based on these facts:

> *See attached Affidavit*
> ☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

*Jeffrey Hedrick, U.S. Postal Inspector*
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, CA          Hon. Jean Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA:  J. Mitchell x0698

**AFFIDAVIT**

I, Jeffrey Hedrick, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.   I am a United States Postal Inspector ("USPI") with the United States Postal Inspection Service ("USPIS") and have been so employed since August 2017.  I am currently assigned to a Mail Fraud team in the Los Angeles Division.  In this capacity, my responsibilities include the investigation of mail fraud and related financial crimes.  As part of my training as a USPI, I completed a 12-week basic training course in Potomac, Maryland, that included training in financial crimes investigations.  I have received additional training from the USPIS, both formal and informal, regarding mail fraud and financial crimes.  Since becoming a USPI, I have participated in numerous interviews of fraud victims and others, participated in the execution of more than a dozen search warrants, and have reviewed and analyzed numerous telephone records.  I am also a member of the International Association of Financial Crimes Investigators.  During this investigation, I have consulted with other law enforcement officers and agents with many years of combined experience in the field of fraud-related investigations.

## II.  PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of an application for a search warrant for the following locations for the items to be seized described in paragraph 3 and Attachment B:

a.    The premises located at 1460 4th Street, Level B,
Santa Monica, CA 90401 ("SUBJECT PREMISES" or the "Tikkun
Holistic Spa"); and

b.    an Apple iPhone, model XS Max, utilizing a phone
number (310)428-5112, bearing International Mobile Subscriber
Identity 310410074039453, subscribed to "Niki Schwarz" at 446
24th St., Santa Monica, CA 90402 ("SUBJECT DEVICE").

3.    The items to be seized, described further in
Attachment B, are the fruits, instrumentalities, and evidence of
violations of 50 U.S.C. §§ 4512 and 4513 (Accumulation of
Designated Scarce Materials with Intent to Price Gouge) and 31
U.S.C. § 5324 (Structuring Transactions to Avoid Reporting
Requirements) (collectively referred to as the "SUBJECT
OFFENSES").  Attachment B is incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of, or investigation into, this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    The USPIS is investigating the unlawful accumulation
of health and medical resources designated by the Secretary of

Health and Human Services as scarce and threatened materials under the Defense Production Act of 1950.

6.    The government, through the use of a cooperating witness and undercover agents, has been in communication with the owner and employees of Tikkun Holistic Spa who have offered personal protective equipment ("PPE"), such as face masks, for sale at multiple times retail prices.

7.    On April 13, 2020, after numerous communications with an employee of Tikkun Holistic Spa, the Federal Bureau of Investigation ("FBI") was able to arrange for an undercover agent ("UC-1") to purchase an N95 mask for $7.99 at the SUBJECT PREMISES, which represents a price approximately 700% greater than the retail price that prevailed in the market before the COVID-19 pandemic.

8.    Between April 18 to 22, 2020, the owner of Tikkun Holistic Spa (NIKI SCHWARZ) used the SUBJECT DEVICE and agreed to sell a cooperating witness ("CW-1") 12,000 N95 masks, to be picked up outside the SUBJECT PREMISES, for $5.00 each, which represents a price approximately 400% greater than the retail price that prevailed in the market before the COVID-19 pandemic.

9.    On April 28, 2020, the FBI interviewed the owner of Tikkun Holistic Spa, who admitted that the spa had previously sold thousands of N95 masks at prices between $5-$8, but said she had only 2,000 masks remaining in her inventory.  The FBI warned the owner against price gouging at that time; however, less than one month later, an employee of Tikkun Holistic Spa advised a USPIS undercover agent ("UC-2") that they have

approximately 7,000 N95 masks on hand and available for sale at
$5 per mask.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.   Background on the COVID-19 Outbreak and the Defense
Production Act**

10.   In December 2019, a novel coronavirus, SARS-CoV-2 (the
"coronavirus" or "COVID-19"), was first detected in Wuhan, Hubei
Province of the People's Republic of China, causing outbreaks of
the coronavirus disease that have since spread globally.  On
January 31, 2020, the Secretary of Health and Human Services
("HHS") declared a national public health emergency under 42
U.S.C. § 247d as a result of the spread of COVID-19 to and
within the United States.  On March 11, 2020, the Director-
General of the World Health Organization characterized COVID-19
as a pandemic.  On March 13, 2020, the President of the United
States issued Proclamation 9994 declaring a national emergency
beginning on March 1, 2020, as a result of the rapid spread of
COVID-19 within the United States.

11.   According to the Centers for Disease Control and
Prevention ("CDC"):

> Current data suggest person-to-person transmission most
> commonly happens during close exposure to a person infected
> with the virus that causes COVID-19, primarily via
> respiratory droplets produced when the infected person
> speaks, coughs, or sneezes. Droplets can land in the
> mouths, noses, or eyes of people who are nearby or possibly
> be inhaled into the lungs of those within close proximity.[1]

---

[1] See CDC, "Coronavirus Disease 2019 (COVID-19) Infection
Control Guidance," https://www.cdc.gov/coronavirus/2019-
ncov/infection-control/control-recommendations.html (last
visited May 19, 2020).

Accordingly, the CDC has issued guidance to health care providers recommending that they wear PPE in certain settings to prevent the coronavirus from being transmitted by infected patients to healthcare providers.

12.  As COVID-19 spreads across the United States, it threatens to overwhelm hospitals and healthcare providers who are required to care for rapidly increasing numbers of seriously ill patients with a rapidly dwindling stock of PPE and other necessary health and medical resources.  Accordingly, on March 18, 2020, the President of the United States issued Executive Order 13909, see 85 Fed. Reg. 16227, invoking the powers vested in the President by the Defense Production Act of 1950, 50 U.S.C. §§ 4501 et seq. (the "Act").

13.  The Act authorizes the President to, among other things, "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2).  The President may exercise this authority "to control the general distribution of any material in the civilian market" only if the President finds "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship."  50 U.S.C. § 4511(b).

14.   "In order to prevent hoarding," the Act further
provides that "no person shall accumulate (1) in excess of the
reasonable demands of business, personal, or home consumption,
or (2) for the purpose of resale at prices in excess of
prevailing market prices, materials which have been designated
by the President as scarce materials or materials the supply of
which would be threatened by such accumulation."  50 U.S.C.
§ 4512.  The Act requires the President to publish in the
Federal Register "every designation of materials the
accumulation of which is unlawful and any withdrawal of such
designation," and authorizes the President to "prescribe such
conditions with respect to the accumulation of materials in
excess of the reasonable demands of business, personal, or home
consumption as he deems necessary to carry out the objectives of
this chapter."  Id.

15.   In Executive Order 13909, the President found "that
health and medical resources needed to respond to the spread of
COVID-19, including personal protective equipment and
ventilators, meet the criteria specified in section 101(b) of
the Act (50 U.S.C. 4511(b))."  The President further delegated
authority to the Secretary of HHS to "identify additional
specific health and medical resources that meet the criteria of
section 101(b)."

16.   On March 23, 2020, the President issued Executive
Order 13910, see 85 Fed. Reg. 17,001, declaring that:

        To ensure that our Nation's healthcare systems are able to
        surge capacity and capability to respond to the spread of

COVID-19, it is the policy of the United States that health
and medical resources needed to respond to the spread of
COVID-19, such as personal protective equipment and
sanitizing and disinfecting products, are not hoarded.

17.  Accordingly, the President delegated to the Secretary
of HHS the President's authority under 50 U.S.C. § 4512  "to
prevent hoarding of health and medical resources necessary to
respond to the spread of COVID-19 within the United States," and
"to implement any restrictions on hoarding."

18.  On March 25, 2020, the Secretary of HHS exercised the
authority delegated to the Secretary of HHS by the President to
respond to the spread of COVID-19 within the United States.  The
Secretary of HHS published a notice, <u>see</u> 85 Fed. Reg. 17592,
designating the following health and medical resources under the
Act as scarce materials or materials the supply of which would
be threatened by accumulation in excess of reasonable demands of
business, personal, or home consumption, or for the purpose of
resale at prices in excess of prevailing market prices:

       a.    N-95 Filtering Facepiece Respirators
       b.    Other Filtering Facepiece Respirators (e.g.,
those designated as N99, N100, R95, R99, R100, or P95, P99,
P100)
       c.    Elastomeric, air-purifying respirators and
appropriate particulate filters/cartridges
       d.    Powered Air Purifying Respirator (PAPR)
       e.    Portable Ventilators
       f.    Chloroquine phosphate or hydroxychloroquine HCl
       g.    Sterilization services for certain medical
devices and certain sterilizers
       h.    Disinfecting devices and other sanitizing and
disinfecting products suitable for use in a clinical setting
       i.    Medical gowns or apparel, e.g., surgical gowns or
isolation gowns
       j.    Personal protective equipment (PPE) coveralls,
e.g., Tyvek Suits
       k.    PPE face masks

      l.    PPE surgical masks
      m.    PPE face shields
      n.    PPE gloves or surgical gloves
      o.    Ventilators, anesthesia gas machines modified for use as ventilators, and positive pressure breathing devices modified for use as ventilators, ventilator tubing connectors, and ventilator accessories

19. Despite these efforts, the news media has regularly reported on the widespread shortages of PPE and other healthcare and medical supplies needed to respond to the spread of COVID-19. In addition, the news media has reported that the serious shortage of N-95 filtering facepiece respirators ("N95 masks") has prompted brokers or vendors to approach hospitals, medical supply companies and healthcare providers offering to supply N95 masks at prices as high as between $4.00 and $9.00 per mask, far in excess of the approximately $1.00-per-mask retail price that prevailed in the market before COVID-19 began to spread widely in the United States.[2]

20. The Defense Production Act makes the willful performance of any act prohibited by § 4512, "or any rule, regulation or order thereunder," a crime punishable by a fine of not more than $10,000 or imprisonment for not more than one year. 50 U.S.C. § 4513. Accordingly, willfully accumulating designated scarce or threatened materials either (1) in excess of the reasonable demands of business, personal, or home

---

[2] See Joseph Tanfani and Josh Horwitz, "Special Report: The Mask Middlemen - How pop-up brokers seek big paydays in a frenzied market," Reuters, Mar. 31, 2020, available at https://www.reuters.com/article/us-health-coronavirus-masks-specialrepor/special-report-the-mask-middlemen-how-pop-up-brokers-seek-big-paydays-in-a-frenzied-market-idUSKBN21I32E (last visited May 19, 2020).

consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, is a criminal offense.

    **B.   The Investigation into Niki Schwarz and Tikkun Holistic Spa**

    21.   In April 2020, law enforcement received a consumer complaint alleging that Tikkun Holistic Spa was price gouging PPE, including selling 3M N95 face masks for $15 and lesser known brands of N95 masks for between $5-8.   The complaint stated that Tikkun had sold thousands of masks, and had thousands more inside the store.

    22.   On April 13, 2020, UC-1 contacted Tikkun Holistic Spa at the business's publicly listed phone number ending in 1111 (the "Tikkun Phone Number").   The call was answered by an employee who identified herself as "Pam."   "Pam" stated Tikkun Holistic Spa had Alpha Pro Tech brand N95 masks available for sale.   In the course of this and subsequent calls that same day, UC-1 agreed to purchase one N95 mask and one mask liner, for $7.99 and $2.00, respectively, and arranged for the purchase and pickup of the items.   Later that day, UC-1 drove to the alley behind Tikkun Holistic Spa (SUBJECT PREMISES), following directions provided by "Pam."   Once parked in the alley, UC-1 called "Pam" to let her know he had arrived, and a female who answered to the name "Pam" appeared in the alley.   In exchange for $10 cash from UC-1, "Pam" handed UC-1 a bag containing one N95 mask, one mask liner, a receipt and one page of typed instructions regarding how to reuse N95 masks.

23.   In April 2020, CW-1 contacted Tikkun Holistic Spa using the Tikkun Phone Number, to inquire about the purchase of 12,000 N95 masks.  The individual who answered the call self-identified as "Pam." "Pam" indicated the business was still selling N95 masks and stated she would put CW-1 in touch with her boss, "Niki," who could "probably hook [CW-1] up."  In a subsequent call, "Pam" provided CW-1 a phone number for "Niki Schwarz" ending in 5112 (SUBJECT DEVICE) and instructed CW-1 to call SCHWARZ.

24.   CW-1 had multiple recorded conversations with SCHWARZ via the SUBJECT DEVICE from April 18 to 22, 2020.  From my review of those recorded conversations, I learned the following:

a.   SCHWARZ realized in early February she could not order masks for her husband's orthopedic surgery practice so she began searching for other sources of masks, including online. At some point, SCHWARZ paid $10 per N95 mask for masks made by 3M and saw others listed for sale as high as $20 per mask. According to SCHWARZ, N95 masks used to cost $1.00 or $1.50 each.

b.   During a call on April 18, 2020, CW-1 noted that price gouging was a crime, to which SCHWARZ did not directly respond.  Later in that call, CW-1 queried whether SCHWARZ's supplier knew price gouging was a crime, to which SCHWARZ responded that she thought her supplier bought the masks for a high price too and characterized $5 per mask as "cheap . . . right now."  Later in the call, SCHWARZ suggested that

once coronavirus was over, there would be an overabundance of masks and they would be selling for "like 50 cents."

c.   CW-1 asked SCHWARZ about her supplier, and SCHWARZ replied that her suppliers were "all connected with the Chinese government." SCHWARZ explained that the "propaganda [was] that everybody needs to buy up everything in America and send it to China." SCHWARZ stated that her particular supplier had purchased two pallets of N95 masks, or approximately two million masks, in the United States to send to the Chinese government but the masks were backordered. By the time the supplier received the masks, the Chinese government no longer needed the additional masks. As a result, the supplier began selling the masks to "whoever pays him the most money." SCHWARZ told CW-1 (a potential customer) that she purchased masks from this supplier for $5 each, but SCHWARZ did not actually know, or have direct contact with, the supplier. Rather, SCHWARZ obtained the masks through an intermediary. SCHWARZ suggested the $5 price was "not a bad price" for masks manufactured in the United States, compared to cheaper masks from Asia, which would be subject to shipping costs, time delays, and customs taxes.

d.   SCHWARZ described the buying of the masks as "like a whole black market thing." SCHWARZ stated that suppliers required purchases be made in cash and that these people "[didn't] want any trace of money going to them." With regard to SCHWARZ's particular mask supplier, SCHWARZ described what he was doing as "not really kosher" and noted she could not get a receipt for her mask purchases. SCHWARZ stated that her

intermediary supplier had advised SCHWARZ to accept only cash from her customers.  SCHWARZ described him as not trusting anyone and said he would not deal with CW-1 directly since he did not know her.  SCHWARZ also said the supplier delivers the masks late at night.  SCHWARZ stated, while audibly laughing, "I feel like, you know, like I'm doing some drug deal or something."  SCHWARZ also said her suppliers were "very protective too because they don't want to get caught either."

      e.   SCHWARZ acknowledged hospitals' needs for N95 masks, stating at one point, "I only had a few thousand masks and if I donated all my masks to a hospital, it's gone in one day."  SCHWARZ believed the masks she had previously given to hospitals were being stockpiled and some doctors were not being provided masks for their use.

      f.   SCHWARZ expressed the view that not only doctors but the general public needed access to N95 masks, saying "it's bullshit what the government was telling us, don't wear a mask and [only] doctors need to wear N95s.  I said, no, you know, this virus is spreading deadly and when you go to the grocery market to buy food for your family you need to protect yourself too so you're not spreading the disease to your family and to everyone else."  SCHWARZ described cloth masks, as opposed to N95 masks, as "ridiculous," and said the people wearing them were not actually protected and it was worse than wearing nothing at all.

      g.   SCHWARZ justified reselling N95 masks for $7.95 because she stated that she gave away some masks and sold others

to doctors at cost, which she indicated was $5 per mask.[3]
SCHWARZ indicated she was willing to sell masks to CW-1 at $5
per mask, the same price she offered for large orders and to
hospitals.[4]

       h.   SCHWARZ stated that she had also obtained 24
hazmat suits from her supplier, and advertised them on her
Facebook page.

       i.   SCHWARZ stated that in order to obtain enough
cash to make bulk purchases of masks she had been going to
multiple banks to withdraw cash from different accounts, $5,000
at a time.  SCHWARZ noted that cash withdrawals of more than
$10,000 are recorded.

       j.   SCHWARZ stated she was "running [mask sales]
through [her] business . . . so everything that [she's] buying
goes in and everything [they] are selling goes out" and they
"have a record of it."  SCHWARZ, however, indicated she did not
have a record of what she bought and who she paid for it, but
instead "all [she had was this] cash that [she] had been
withdrawing from [her] bank."

       k.   On April 20, 2020, SCHWARZ agreed to sell 12,000
masks to CW-1, and confirmed that she had spoken with her

---

[3] As further described below, during a later interview with
Special Agents with the FBI, SCHWARZ's description of her cost
varied during the interview. At one point she stated her costs
were between $4 to $5 per mask, but when she provided the actual
dollar amounts she paid, her costs were between $3.33 to $3.80
per mask.

[4] CW-1 cover story was that she wanted to purchase 12,000
masks for nurses.

supplier.  SCHWARZ expressed a preference for payment by
cashier's check to ensure CW-1's payment would not bounce.  On a
previous call, SCHWARZ had proposed that CW-1 pay for the masks
via three $20,000 checks payable to SCHWARZ's landlord for the
spa, so SCHWARZ would not have to "be stuck with, you know,
what's this money transaction coming in and out."

25.  In addition, CW-1 received more than 15 text messages
from the SUBJECT DEVICE in connection with CW-1's inquiries to
SCHWARZ about purchasing N95 masks and other PPE.  One of these
text messages to CW-1 appears to have been sent in an effort to
confirm CW-1's intention to purchase 12,000 N95 masks.
Specifically, CW-1 received the following text message from the
SUBJECT DEVICE on April 21, 2020:  "I just want to confirm that
100% you want 12,000 masks."

26.  On April 28, 2020, FBI Special Agents interviewed
SCHWARZ at her residence.  During which interview, SCHWARZ
provided the following information:

a.  For the past 11 years, SCHWARZ has owned Tikkun
Holistic Spa with her husband, a surgeon.  Tikkun Holistic Spa
employs Klaudia Dabek and at least one other employee.

b.  In early February 2020, SCHWARZ began looking for
N95 masks to buy for her husband and his medical practice in
light of the COVID-19 global pandemic.  At that time, SCHWARZ
did not have prior knowledge of N95 masks and did not imagine
being in the business of buying and selling N95 masks.  SCHWARZ
initially found N95 masks for sale on eBay and Amazon for $20 to
$30 per mask.  After that, SCHWARZ began calling and visiting

various places to obtain masks.  Through an unidentified female
friend, SCHWARZ connected with an unidentified Chinese male who
sold 3M N95 masks.  SCHWARZ purchased approximately 20 boxes of
3M N95 masks (20 masks per box) from this unidentified male for
$125 to $150 per box.

c.    SCHWARZ was connected to a Chinese male with a
first initial "L" ("L"), from whom SCHWARZ began purchasing
Alpha Pro Tech N95 masks.  L accepted only cash for purchases
and did not provide receipts or other transactional
documentation.  SCHWARZ showed the FBI agents L's contact
information, as saved in her cell phone, which indicated that L
used phone number ending in 7152.

d.    SCHWARZ stated that she purchased masks from L
for either $4 to $5 each.  SCHWARZ then described her
transactions with L and stated that she paid $700 to $800 per
case of 210 masks; however, $700 to $800 per 210 masks equates
to $3.33 to $3.80 per mask.  After receiving N95 masks from L at
her residence, SCHWARZ would transport the masks to the SUBJECT
PREMISES as needed.

e.    On or about March 17, 2020, SCHWARZ emailed
10,000 of her customers to announce she had masks and sanitizers
available for sale at Tikkun Holistic Spa (SUBJECT PREMISES).
Clients could place orders by calling the spa's business
telephone number and pick up their orders from the alley behind
the business.  SCHWARZ's employees sold the items at the spa.

f.    Tikkun Holistic Spa charged customers $7.99 per N95 mask, except for bulk orders, which were priced at $5 per mask.

g.    SCHWARZ indicated Tikkun Holistic Spa used Mindbody software for its accounting.  Employees maintained an inventory of the masks being bought and sold.

h.    In addition to N95 masks, Tikkun Holistic Spa also began selling hand sanitizer.  SCHWARZ sold 6-ounce bottles of "Aloe Vera Hand Sanitizer" for $9.95 each.  To produce the bottles, SCHWARZ purchased one-gallon containers of hand sanitizer online.  SCHWARZ and her staff then filled the 6-ounce bottles with this sanitizer and placed Tikkun stickers on the bottles for sale.  SCHWARZ also sold 4-ounce bottles of "all natural" anti-bacterial hand sanitizer for $12.00 each that she purchased in bulk.

i.    SCHWARZ stated that she sold masks to "Tevan" (last name unknown) with telephone number ending in 2906 ("Tevan's Phone Number"); "Lisa" (last name unknown) with telephone number ending in 7088 ("Lisa's Phone Number"); and S.R. with telephone number ending in 0347 ("S.R.'s Phone Number").

j.    Finally, during the interview, SCHWARZ stated that she had approximately 2,000 masks at the SUBJECT PREMISES available for sale, and 200 masks at her residence for her family.  The interviewing agents advised SCHWARZ that as a result of the Defense Production Act, certain materials were designated as scarce.  Specifically, the agents advised that by

acquiring large quantities of N95 masks and hand sanitizers, and by selling these items at inflated prices multiples above SCHWARZ's purchasing price, SCHWARZ may be engaged in activity that potentially violates state and federal laws regarding hoarding and price gouging.

### C.  SCHWARZ Continues to Accumulate and Sell N95 Masks

27.  On May 23, 2020, a USPIS Postal Inspector acting in an undercover capacity ("UC-2") called the Tikkun Phone Number, the same phone number listed on Tikkun Holistic Spa's website.  An employee, who identified herself as "Klaudia," stated that they have approximately 7,000 N95 masks on hand and available for sale at $5 each, but they no longer provided discounts for nurses or bulk orders.

### D.  Electronic Devices are likely to Contain Evidence of the SUBJECT OFFENSES

28.  As detailed above, during the FBI Interview, SCHWARZ stated that Tikkun Holistic Spa uses "Mindbody" software for its accounting, and employees maintained an inventory of the masks being bought and sold.  On May 20, 2020, I conducted an online search for Mindbody, through which I identified Mindbody, Inc., with website www.mindbodyonline.com.  Through my review of this website, I learned that Mindbody offers business management software specifically intended for spa businesses, and with functionality that includes point-of-sale, payment processing, inventory tracking, and marketing tools.

29.  On or about May 18, 2020, I received records for the SUBJECT DEVICE from AT&T.  Those records listed the user of the

SUBJECT DEVICE as "Niki Schwarz."  Those records further listed
an IMSI of 310410074039453 and the phone model used from at
least December 2019 to May 2020 as an Apple iPhone XS Max.
AT&Ts records show that between March 30, 2020, and April 22,
2020, there were more than 25 calls lasting 30 seconds or
longer, and approximately 12 text messages, to or from the
SUBJECT DEVICE to "L."  In addition, during one of SCHWARZ's
calls with CW-1 on April 18, 2020, SCHWARZ indicated she had
texted her supplier's intermediary the previous day to acquire
additional masks for CW-1.  Finally, the AT&T records also
confirmed SCHWARZ's admission that she used the SUBJECT DEVICE
to call, and receive calls, from Tevan's Phone Number, Lisa's
Phone Number and S.R.'s Phone Number in March and/or April 2020.

30.  As previously indicated, on May 23, 2020, UC-2 called
Tikkun Holistic Spa and spoke to an employee who identified
herself as "Klaudia."  During the call, Klaudia offered to text
UC-2 photographs of the packaging for the N95 masks sold by
Tikkun Holistic Spa.  A few minutes after the call ended, UC-2
received three images from a phone number ending in 4395 that
appeared to depict the packaging for Alpha Pro Tech N95 masks.
On a subsequent phone call with UC-2, Klaudia told UC-2 that UC-
2 could contact her via cell phone, and confirmed the phone
number from which she had previously sent UC-2 the photographs.

## V.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[5]

31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

_____

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

    c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

    d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    32.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SCHWARZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of SCHWARZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

34.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.  CONCLUSION

35.  For all the reasons described above, there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described above and in Attachment B of this affidavit, will be found in searches of the SUBJECT PREMISES and

SUBJECT DEVICE, as further described above and in Attachments A-1 and A-2 of this affidavit.

_____

JEFFREY HEDRICK
United States Postal Inspector
U.S. Postal Inspection Service

Subscribed to and sworn before me
on June 26, 2020.


_____
HONORABLE JEAN ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

I.   **PREMISES TO BE SEARCHED**

The premises known as 1460 4th Street, Level B, Santa Monica, CA
90401 ("SUBJECT PREMISES").  The SUBJECT PREMISES is located in
a multi-story office building that bears the number "1460" in
vertically oriented dark lettering on the east-facing wall of
the building.  The SUBJECT PREMISES is located on the lower
level, designated as level "B," of the building and is
identified by a rectangular light-blue placard displaying
"TIKKUN HOLISTIC SPA" on a clear glass entry door.

**ATTACHMENT A-2**

## I.   PREMISES TO BE SEARCHED

an Apple iPhone, model XS Max, utilizing a phone number
(310)428-5112, bearing International Mobile Subscriber Identity
310410074039453, subscribed to "Niki Schwarz" at 446 24th
Street, Santa Monica, CA 90402 ("SUBJECT DEVICE").

**ATTACHMENT B**

II. **ITEMS TO BE SEIZED**

  1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 50 U.S.C. §§ 4512 and 4513 (Accumulation of Designated Scarce Materials with Intent to Price Gouge) and 31 U.S.C. § 5324 (Structuring Transactions to Avoid Reporting Requirements) (the "Subject Offenses"), namely:

   a. Personal protective equipment ("PPE") including but not limited to N95 masks.

   b. For the period beginning February 1, 2020, accounting and financial records concerning prices, costs, and profit margins for PPE, including: financial statements; general ledgers; profit/loss statements; payroll; wage records and reporting; accounts receivable and payable; cash flow and cash management; cost of goods sold; business expenses; employee expense reimbursement; revenue and profit; purchase orders, invoices, bills, receipts and records of purchases or sales of any kind; financial reports and submissions.

   c. For the period beginning February 1, 20200, information and objects concerning marketing, advertising, selling, and offering the sale of PPE, including any and all communications sent or received in connection with marketing, advertising, selling, and offering the sale of PPE, including but not limited to N95 masks, and other PPE.

   d. Evidence of who used or owned any computer, electronic media or device, such as user accounts, logs,

registry entries, internet usage records, usernames, logins, passwords, email addresses or online identities, billing, account, and subscriber records, chat room logs, chat records, membership in online groups, clubs or services, connections to online or remote computer storage, and electronic files.

       e.    For the period beginning February 1, 2020, information and objects concerning the proceeds and use of proceeds of the SUBJECT OFFENSES, including: bulk cash; cryptocurrencies (including for example Bitcoin, Ethereum, Monero) and related wallets, identifiers and access keys; ledgers; jewelry; real estate transaction records; deeds, loan records; foreign bank and investment accounts; securities; bearer bonds; art.

       f.    Evidence concerning occupancy or ownership of the SUBJECT PREMISES, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, and telephone directories.

       g.    For the period beginning February 1, 2020, information and objects concerning the identity and whereabouts of suppliers, brokers, and other participants in the SUBJECT OFFENSES.

       h.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

i.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.      records of or information about
Internet Protocol addresses used by the device;

ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

4

## III. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

5

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys,
test keys, encryption codes, or other information necessary to
access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law
enforcement is permitted to: (1) depress SCHWARZ's and Klaudia
Dabek's thumb and/or fingers onto the fingerprint sensor of the
device (only when the device has such a sensor), and direct
which specific finger(s) and/or thumb(s) shall be depressed; and
(2) hold the device in front of SCHWARZ's and Klaudia Dabek's
face with his or her eyes open to activate the facial-, iris-,

8

or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

9